# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

COMMODITY FUTURES TRADING )    Civil No. 04cv2093 J (NLS)
COMMISSION, )
                                          )    **ORDER GRANTING PLAINTIFF'S**
              Plaintiff, )    **MOTION FOR SUMMARY**
        v. )    **JUDGMENT [Doc. No. 191.]**
                                          )
WHITE PINE TRUST CORPORATION, )
a California corporation; RICHARD )
MATTHEWS, an individual; and )
STEPHAN BAERE, an individual, )
                                          )
              Defendants, )
                                          )
                                          )
LUCIA MATTHEWS, an individual, )
              Relief Defendant. )
                                          )
_____ )

Before the Court is Plaintiff Commodity Futures Trading Commission's ("Plaintiff

CFTC") Motion for Summary Judgment against Defendant Stephan Baere ("Defendant"). [Doc.

No. 191.] Defendant has filed an Opposition to the Motion for Summary Judgment

("Opposition"), and Plaintiff has filed a Reply to the Opposition ("Reply"). [Doc. Nos. 197,

214.] The Court has determined that the issues presented herein are appropriate for decision

without oral argument. *See* S.D. Cal. Civ. R. 7.1(d)(1). For the reasons discussed herein, the

Court **GRANTS** Plaintiff's Motion for Summary Judgment.

## *Background*

The following facts are either stipulated, supported by affidavit or deposition testimony,

uncontroverted or viewed in the light most favorable to Defendant Baere, the nonmoving party.

1　The Court excludes factual assertions that are immaterial or that are conclusions of law rather

2　than statements of fact.

3　　　On or about July of 2000, Richard R. Matthews, Jr. formed White Pine Trust Corporation

4　("WPT") to solicit investments from members of the public into the "Pinnacle Capital Fund," a

5　foreign currency trading fund managed by WPT.  (*See* Pl.'s Mem. Supp. Mot. Summ. J. at 2; Ex.

6　1, Baere Plea Agreement at 3.)  In 2002, Defendant Baere became WPT's Director of Business

7　Development and actively solicited funds from the public in to the Pinnacle Capital Fund.  (*See*

8　*id.* at 2-3; Ex. 1, Baere Plea Agreement at 3.)

9　　　Plaintiff alleges that since at least August 2000, Defendants White Pine Trust Corporation

10　("White Pine"), Richard Matthews, and Stephan Baere (collectively, "Defendants") have been

11　illegally operating a foreign currency trading firm out of San Diego, California.  (*See* First Am.

12　Compl. at 1-2.)  Plaintiff claims that through direct solicitation and a web site, Defendants

13　invited retail customers to trade purported foreign-currency contracts and foreign-currency

14　options contracts.  (*See id.* at 2.)  Furthermore, Plaintiff contends that since at least February

15　2003, Defendants have solicited at least $650,000 in customer funds from at least three

16　customers, and solicited millions of additional dollars from hundreds of other retail customers.

17　(*See id.* at 1-2.)  Plaintiff alleges that Defendant Baere knowingly and intentionally made several

18　false statements and provided false and misleading solicitation materials to investors and

19　potential investors.  (*See* Pl.'s Mem. Supp. Mot. Summ. J. at 3.)  Plaintiff further alleges that the

20　solicitations and solicitation materials made representations offering investment in options.  (*See*

21　*id.* at 5.)  Specifically, Plaintiff alleges that "[D]efendant Baere has engaged in the fraudulent

22　solicitation of customer funds and, consequently, violated Section 4c(b) of the [Commodity

23　Exchange] Act [("the Act")], 7 U.S.C. § 6c(b) (2002), and Commission Regulation 1.1, 32.9(a)

24　and (c) pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2002)."  (First Am.

25　Compl. at 3.)

26　//

27　//

28　//

1

*Legal Standard*

2       Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure

3  on "all or any part" of a claim where there is an absence of a genuine issue of material fact and

4  the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *see also Celotex*

5  *Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

6  dispose of factually unsupported claims or defenses.  *See Celetox*, 477 U.S. at 323-24.  A fact is

7  material when, under the governing substantive law, the fact might affect the outcome of the

8  case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Freeman v.*

9  *Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute about a material fact is genuine if "the

10 evidence is such that a reasonable jury could return a verdict for the nonmoving party."

11 *Anderson*, 477 U.S. at 248.  When making its determination, the Court must view all inferences

12 drawn from the underlying facts in the light most favorable to the party opposing the motion.

13 *See Matsushita Elec. Indus. Co. Ltd.  v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

14      The party seeking summary judgment bears the initial burden of establishing the absence

15 of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 323.  If the moving party has the

16 burden of proof at trial, that party must carry its initial burden at summary judgment by

17 presenting evidence affirmatively showing, for all essential elements of its case, that no

18 reasonable jury could find for the non-moving party.  *See United States v. Four Parcels of Real*

19 *Property*, 941 F.2d 1428, 1438 (11th Cir. 1991); *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d

20 975, 987 (9th Cir. 2006).  When the non-moving party has the burden of proof at trial, the

21 moving party can satisfy this burden in two ways: (1) by presenting evidence to negate an

22 essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

23 party failed to make a showing sufficient to establish an element of his or her claim on which

24 that party will bear the burden of proof at trial.  *See id.* at 322-23.  If the moving party fails to

25 discharge this initial burden, summary judgment must be denied and the court need not consider

26 the nonmoving party's evidence.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60

27 (1970).

28

If the moving party meets the initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. "The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient." *Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) (citing *Anderson*, 477 U.S. at 252); *see also Matsushita*, 475 U.S. at 586 (if the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment by merely demonstrating "that there is some metaphysical doubt as to the material facts"). It is insufficient for the party opposing summary judgment to "rest upon the mere allegations or denials of [his or her] pleadings." Fed. R. Civ. P. 56(e). Rather, the party opposing summary judgment must "by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P 56(e)). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In addition, the Court is not obligated "to scour the records in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). "[T]he district court may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita*, 475 U.S. at 587 (citing *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). Moreover, "[a] district court must enter summary judgment against a party who fails to make a showing sufficient to establish an essential element of a claim, even if genuine factual disputes exist regarding other elements of the claim." *Cunningham v. City of Wenatchee*, 214 F. Supp. 2d 1103, 1110 (E.D. Wash. 2002) (citing *Celotex*, 477 U.S. at 323-24.)

//

//

*Discussion*

Plaintiff asserts that "the undisputed facts establish that [D]efendant Baere engaged in a fraud in connection with his solicitation of customers and potential customers to invest in White Pine Trust Co.'s Pinnacle Capital Fund—a 'managed foreign currency fund' operated by White Pine and offering the use of options as part of its investment strategy." (Pl.'s Notice of Mot. Summ. J. at 2.) Plaintiff, thus, argues that the "undisputed evidence establishes that the solicitations employed by Baere were replete with material misrepresentations which constitute a violation of 7 U.S.C. § 6c(b) (2002), and 17 C.F.R. §§ 1.1 and 32.9." (*Id.*) Defendant Baere counters that the Court does not have subject matter jurisdiction and the CFTC does not have authority over this matter. (*See* Def.'s Opp'n at 1-2.) Defendant further argues that Plaintiff cannot satisfy the scienter requirement for a fraud violation. (*See id.* at 8.) For the reasons set forth below, the Court **GRANTS** Plaintiff's Motion for Summary Judgment.

## I.   **Jurisdiction**

In the First Amended Complaint, Plaintiff alleges that "[D]efendant Baere has engaged in the fraudulent solicitation of customer funds and, consequently, violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2002), and Commission Regulation 1.1, 32.9(a) and (c) pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2002)." (First Am. Compl. at 3.) Plaintiff asserts in the Complaint that the Court has jurisdiction over the action pursuant to Section 6c, 17 U.S.C. § 13a-l, and that the CFTC has jurisdiction pursuant to Section 2(c)(2)(B), 7 U.S.C. § 2(c)(2)(B). (*See id.* at 4.) For the reasons discussed below, the Court **FINDS** that jurisdiction is proper in the present case.

Pursuant to Section 13a-1:

> Whenever it shall appear to the Commission that any registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future delivery, the Commission may bring an action in the proper district court of the United States or the proper United States court of any territory or other place subject to the jurisdiction of the United States, to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder, and said courts shall have jurisdiction to entertain such actions . . . .

7 U.S.C. § 13a-1 (2000). With respect to CFTC's jurisdiction, pursuant to Section 2(c)(2)(B):

[T]he Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that--

> (I) is a contract of sale of a commodity for future delivery (or an option on such a contract) or an option (other than an option executed or traded on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 [15 U.S.C. 78f(a)]); and

> (ii) *is offered to, or* entered into with, a person that is not an eligible contract participant, [unless the counterparty is one of the six designated regulated entities] . . . .

7 U.S.C. § 2(c)(2)(B) (2002) (emphasis added).  Additionally, pursuant to Section 6c(b), "[n]o person shall *offer* to enter into, enter into or confirm the execution of, any transaction involving any commodity . . . commonly known to the trade as, an 'option' . . . contrary to any rule, regulation, or order of the Commission prohibiting any such transaction . . . . 7 U.S.C. § 6c(b) (2000) (emphasis added).  Likewise, 17 C.F.R. Section 32.9 makes it "unlawful for any person directly or indirectly" to cheat or defraud or attempt to cheat or defraud "in or in connection with an *offer to enter into*, the entry into, or the confirmation of the execution of, any commodity option transaction."  17 C.F.R. § 32.9 (1994); *see also* 17 C.F.R. § 1.1 (2001).  Accordingly, a facial review of the relevant statutory authority suggests that a fraudulent offer or solicitation (and not solely actual transactions) is sufficient to confer jurisdiction upon the CFTC.

Here, Plaintiff has provided White Pine Trust solicitation materials that make specific reference the use of options.  For example, both the White Pine Trust web site and prospectus state that:

> WPT utilizes covered call options to protect some positions and to gain option premium.  We have achieved significant advantages with these quasi-hedges over outright naked positions.  The primary objective in using covered calls is to know the maximum risk and reward before a position is taken.  While a certain familiarity with options is assumed, a few brief definitions are in order.  A covered call is a purchase of an underlying instrument, i.e., a yen/dollar and the sale of a call against it.  The profit received and credited to the account is the option premium.  The primary purpose of a covered call is to obtain profit from the premium received through time decay.

(*See* Pl.'s Mem. Supp. Mot. Summ. J. ; Ex. 5 at CFTC SB 00079, Ex. 7 at CFTC SB 00112.)  Additionally, Defendant Baere has admitted to knowing that the marketing materials made representations to options.  (*See id*; Ex. 9, Baere Dep. 41:18-20.)  In the declaration provided by Plaintiff, a customer, Patrick O'Connor, states that "Stephan Baere told me that my investment

would be managed by professionals experienced in foreign currency options trading." (Ex. 3, O'Connor Decl. at 2-3.) Such evidence, at a minimum, satisfies the "directly or indirectly" and "in connection with an offer to enter into" an option transaction language of the statute.[1]  *See* 17 C.F.R. § 32.9 (1994).  Additionally, Defendant was not a proper counterparty who could offer and/or enter into foreign currency option transactions with persons who are not eligible contract participants.  (*See* Ex. 12, Decl. of Kara Mucha at 1-4.)[2]

Defendant's reliance on *Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107 (9th Cir. 1999), is misplaced.  Defendant cites to *Topworth* in support of his contention that "given appropriate information, the federal court should uphold jurisdiction as to those transactions where it is applicable and deny it where it is not." (Def.'s Opp'n at 7.)  In *Topworth*, however, the U.S. Court of Appeals for the Ninth Circuit declined to decide the issue of how the CFTC would exercise its authority when an entity engages in mixed trading, some of which are covered by the statute and some of which are not, because the factual record was insufficient to show the percentage of exempt trades.  *See Topworth Int'l, Ltd.*, 205 F.3d at 1115.  Nevertheless, the Ninth Circuit held that in a case "in which no company records of trades

---

[1] As evidence of the promotion and trading of options, Plaintiff has also provided an e-mail exchange, which Plaintiff alleges involved Defendant Baere and a WPT customer.  (*See* Ex. 8, CFTC SB 00181.)  However, Defendant states that he was gone from WPT when the exchange occurred and did not send the e-mail in question.  (*See* Baere Decl. at 3.)  In fact, while the e-mail was purportedly sent by Patrick O'Connor to Stephan Baere (based on the recipient address), the return e-mail, which makes reference to options, lists rich@whitepine.sdcoxmail.com as the sender.  Accordingly, the Court does not consider the disputed e-mail as evidence of options promotion or trading.  Nevertheless, Plaintiff has provided sufficient evidence to show the solicitation of options.

[2] Defendant has objected to Plaintiff's inclusion of Kara Mucha's Declaration as untimely and without factual basis.  For the following reasons, the Court **OVERRULES** Defendant's objection.  Defendant cites to *Pfingston v. Ronan Engineering*, 284 F.3d 999, 1003 (9th Cir. 2000), for the proposition that since Plaintiff did not designate Kara Mucha as an expert within the time provided by the scheduling order, it should be excluded.  However, the Ninth Circuit, in *Pfingston*, refused to review an affidavit submitted after the district court had granted summary judgment.  *See id.* at 1003, n.3.  Here, Plaintiff has not designated Ms. Mucha as an expert, but is rather employing her declaration to provide a factual basis for the fact that WPT and Pinnacle Capital Trust were neither proper counter-parties nor registered as futures commissions merchants.  Ms. Mucha's declaration cites to the National Futures Association Deputy Record Custodian's declarations as a factual basis for the conclusion that WPT and Pinnacle Capital Trust were not registered as futures commissions merchants.

04cv2093 J (NLS)

1    are available and there is indeed little evidence that trades even occurred, the CFTC may

2    exercise its authority over mixed trading." *Id.*

3    Accordingly, since Plaintiff's claims are based on the fraudulent solicitation of options,

4    the Court **FINDS** that the CFTC has jurisdiction over the alleged conduct and the case was

5    properly brought before this Court.

6    **II.    Fraudulent Solicitation**

7    Plaintiff alleges that Defendant Baere fraudulently solicited customers and potential

8    customers in connection with an offer to enter into an options contract in violation of 7 U.S.C. §

9    6c(b) and 17 C.F.R. §§ 1.1, 32.9.  (*See* Pl.'s Mem. Supp. Mot. Summ. J. at 10.)  Plaintiff alleges

10   that Defendant Baere made several false and materially misleading representations and

11   omissions when soliciting customers and potential customers.  (*See id*. at 12.)  Defendant Baere

12   contends that summary judgment is improper because there is insufficient evidence of scienter.

13   (Def.'s Opp'n at 8.)  Defendant argues that "there is no evidence before the [C]ourt on which it

14   can legitimately be argued that Stephan Baere understood the operation in which he was

15   involved as other than discretionary, segregated 'managed accounts,' emphasizing foreign

16   currency investments with certain [sic] believed to be accurate returns reported monthly to the

17   investors."  (*See id*.)

18   As described above, pursuant to Section 6c(b), "[n]o person shall *offer* to enter into, enter

19   into or confirm the execution of, any transaction involving any commodity . . . commonly known

20   to the trade as, an 'option' . . . contrary to any rule, regulation, or order of the Commission

21   prohibiting any such transaction . . . .  7 U.S.C. § 6c(b) (2000) (emphasis added).  17 C.F.R.

22   Section 32.9 makes it "unlawful for any person directly or indirectly" to cheat or defraud or

23   attempt to cheat or defraud "in or in connection with an *offer to enter into*, the entry into, or the

24   confirmation of the execution of, any commodity option transaction."  17 C.F.R. § 32.9 (1994);

25   *see also* 17 C.F.R. § 1.1 (2001).  In order to establish liability for fraud under the Act, Plaintiff

26   has the burden of proving three elements:  "(1) the making of a misrepresentation, misleading

27   statement, or a deceptive omission; (2) scienter; and (3) materiality."  *CFTC v. R.J. Fitzgerald &*

28   *Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002).  "Failure to establish any one of these elements is

1  dispositive and would preclude" summary judgment on Plaintiff's claims.  *See id.*  "In applying

2  these elements to the present case, [the Court] is guided  by the principle that the [Commodity

3  Exchange Act] is a remedial statute that serves the crucial purpose of protecting the innocent

4  individual investor—who may know little about the intricacies and complexities of the

5  commodities market—from being misled or deceived."  *Id.* at 1329.

6        In determining whether a misrepresentation has been made, the Court should look at "the

7  'overall message' and the 'common understanding of the information conveyed.' "  *Id.* at 1328.

8  Scienter may be established by showing that Defendant Baere "intentionally violated the Act or

9  acted with 'careless disregard' of whether his actions violated the Act."  *CFTC v. Noble Metals

10  Int'l, Inc.*, 67 F.3d 766, 774 (9th Cir. 1995).  However, "[m]ere negligence, mistake, or

11  inadvertence fails to meet" the scienter requirement.  *Id.* (citing *Wasnick v. Refco, Inc.*, 911 F.2d

12  345, 348 (9th Cir. 1990)).  As stated by the Eleventh Circuit, " scienter is met when Defendant's

13  conduct involves 'highly unreasonable omissions or misrepresentations . . . that present a danger

14  of misleading which is either known to the Defendant or so obvious that Defendant must have

15  been aware of it."  *R.J. Fitzgerald & Co.*, 310 F.3d at 1328.  Finally, a representation or

16  omission is material "if a reasonable investor would consider it important in deciding whether to

17  make an investment."  *Id.* at 1328-29 (citing *Affiliated Ute Citizens of Utah v. United States*, 406

18  U.S. 128, 153-54 (1972)).

19        Plaintiff argues that Defendant Baere made the following misleading representations and

20  omissions while soliciting customers:  1) "WPT had been managing private assets through the

21  Pinnacle Capital Fund since 1995, and that the Pinnacle Capital Fund had yielded double-digit

22  profits on investments for each year since 1995" (Ex. 1, Baere Plea Agreement at 4); 2) "WPT

23  commissions were based upon the profitability of the firms trading" (Ex. 9, Baere Dep. at 46:1-

24  10); 3) "[t]he education and training level of WPT account executives was on par with that of

25  corporate treasurers and international bankers" (Ex. 5, CFTC SB 00071; Ex. 9, Baere Dep. at

26  36:19-22); 4) "Baere was involved with WPT since 1998" (Ex. 11, Baere Resp. to Req. Admis.

27  No. 4); 5) "each customer account was held in a separate, segregated account" (Ex. 4; Baere

28  Resp. to Interrog. 11; Ex. 12, Decl. of Kara Mucha at 1-2); and 5) "represented that 'Tom

1  Clausen' was a client of the Pinnacle Capital Fund, who would act as a reference to potential

2  investors (Ex. 1, Baere Plea Agreement at 4)." (*See* Pl.'s Mem. Supp. Mot. Summ. J. at 3-5.)

3         The CFTC has established that Defendant Baere made misrepresentations to customers

4  regarding the earning record and history of WPT, the education of WPT employees, Defendant's

5  own employment history, customer account management, and a fictitious positive reference.

6  Read for its "overall message" and how that message would be interpreted by an objectively

7  reasonable customer, such statements constitute a  misrepresentation regarding WPT's

8  operations.  Evidence put forth by Plaintiff shows that WPT did not start managing investments

9  through the Pinnacle Capital Fund until 2000 (Ex. 1, Baere Plea Agreement at 4),  that

10  compensation was based on commissions per investment (Ex. 9, Baere Dep. at 46:8-10), that the

11  statement indicating that account managers had to undergo "rigorous ACI training" was not true

12  (Ex. 9, Baere Dep. at 36:19-22), that Defendant Baere started with WPT in 2002 (Ex. 1, Baere

13  Plea Agreement at 3), that customer accounts were not segregated (Decl. of Kara Mucha at 1-2),

14  and that Tom Clausen was a fictitious persona (Ex. 1, Baere Plea Agreement at 4). Additionally,

15  Defendant also admitted that his "communication was always the same to each client about who

16  we were, what the investment vehicle was and how it can help diversify one's investment

17  portfolio." (*See* Ex. 4; Baere Resp. to Interrog. 11.)

18         Having determined that Defendant Baere made several misrepresentations while soliciting

19  customers, the Court now turns to the issue of scienter.  At the outset, it is important to note that

20  Defendant Baere has admitted to having knowingly and intentionally made certain

21  misrepresentations.  In his Plea Agreement, Defendant Baere admits the following facts:

22         Beginning in at least January 2002 and continuing up to and including at least
        December 2003, Defendant *knowingly and intentionally* conspired and agreed with
23         other persons, including Richard Robert Matthews, Jr., to implement a material
        scheme to defraud by make [sic] materially false and misleading representations, and
24         omissions of material fact, to members of the general public to obtain money in the
        form of investments into the Pinnacle Capital Fund, and to use the U.S. mails and
25         commercial interstate carrier to execute the fraudulent material scheme.

26         To accomplish the agreement set forth [above], Defendant *knowingly and
        intentionally* represented, and caused others to represent, to investors and potential
27         investors, that White Pine had been managing private assets through the Pinnacle
        Capital Fund since 1995, and that the Pinnacle Capital Fund had yielded net double-
28         digit profits on investments for each year since 1995.  Defendant knew these

representations were false, in that he knew that White Pine did not begin managing private assets through the Pinnacle Capital Fund until in or about the year 2000.

In furtherance of the agreement set forth [above], Defendant *knowingly and intentionally* represented, and caused others to represent, that "Tom Clausen" was a client of the Pinnacle Capital Fund who would act as a reference to potential investors. Defendant knew these representations were false, in that he knew that "Tom Clausen" was not a client of the Pinnacle Capital Fund, but rather a fictitious persona devised to provide a fictitious positive reference to potential investors regarding the Pinnacle Capital Fund.

(Ex. 1, Baere Plea Agreement at 3-4 (emphasis added).) Defendant Baere also concedes that "in fact, the sales staff was not on a par with 'corporate treasurers and international bankers.' " (Def.'s Opp'n at 9.) Defendant Baere has also admitted that he did not start with WPT in 1998 as represented in the solicitation materials. (*Id.*; Ex. 1, Baere Plea Agreement at 3.) Accordingly, scienter is admittedly established with respect to these misrepresentations.

With respect to the profitability of WPT, Defendant states that "Matthews advised that [a Stephan] Mepstead had traded foreign currency successfully since 1995 and that White Pine Trust could use the trading results from and after that date in our presentation, because White Pine Trust and Pinnacle Capital were using the same resource." Defendant also states "Stephen Mepstead was the London based trader that Matthews identified he was going to use when he opened Pinnacle Capital [Management] in September, 1999 . . . ." (Def. Opp'n at 10 (citing Baere Decl. at 4-5).) To show this, Defendant has attached to his declaration a purported copy of Richard Matthew's business license application where Matthew's indicates an intention to use Mr. Mepstead as his trader. (*Id.* (citing Ex. 1 to Baere Decl.).) Defendant Baere, thus, argues that "there is no evidence in the record regarding the accuracy or inaccuracy of the Mepstead profitability figures." (*Id.*) Even assuming the admissibility of the business license provided by Defendant Baere, which is questionable due to the lack of authentication as well as Plaintiff's contention that the document was not provided by Defendant within the discovery period, Defendant's reliance on his knowledge of Mr. Mepstead is irrelevant. As correctly pointed out by Plaintiff, Defendant "fails to point to any place in the solicitation documents or website where WPT's track record reflects the backdated use of Mr. Mepstead's alleged performance." (*See* Pl.'s Reply at 3-4.) Additionally, the "Mepstead profitability figures" have not been provided to the Court. Nevertheless, it remains undisputed that Defendant Baere "knowingly and

11

intentionally represented . . . to investors and potential investors, that White Pine had been managing private assets through the Pinnacle Capital Fund since 1995, and that the Pinnacle Capital Fund had yielded net double-digit profits on investments for each year since 1995." (Ex. 1, Baere Plea Agreement at 3-4.)  Defendant Baere has admitted knowing that WPT had not been in business in 1995 and to making this misrepresentation.  And, it was beyond "careless disregard" for Defendant to misrepresent that WPT had been managing private assets through Pinnacle Capital Fund and associate the alleged profitability of Pinnacle Capital Fund with that of WPT, knowing that WPT had not been in business during that time.

As to the statement on commissions, Defendant argues that "there were no 'trading commissions' and the incentive to the investor was that WPT would be paid a 'performance fee' only if the investments made in the investor's accounts were profitable.  The sales staff, including [Defendant], were paid a 'sales commission' predicated on the amounts successfully solicited, and those payments, to the best of [Defendant's] knowledge came out of White Pine Fund operating funds, not from the investor's investment." (Def. Opp'n at 9; Baere Decl. at 4.)  While Defendant only provides his own declaration to show this alternative commission structure, Defendant fails to show how such a "sales commission" clarifies the statement on commissions in the solicitation materials.  According to the solicitation materials,

> WPT is happy to offer a true "Performance Incentive Fee" structure.  WPT does not receive a fixed management fee or commission for trading an account.  WPT will receive a performance fee equal to 25% on trading profit in the account that is payable monthly.  If, at the end of the month, the account does not profit, WPT does not get compensated.

(Ex. 7, CFTC SB 00113.)  Additionally, Defendant states in his response to an interrogatory, "[i]f you make money we make money.  If we do not secure a profit in a given month, we do not get paid." (Ex. 4; Baere Resp. to Interrog. 11.)

However, in his deposition, Defendant states that he "was compensated on a commission structure on – per investment." (Ex. 9, Baere Dep. 46:8-10.)  Additionally, Defendant's wife, Michele Baere, states that "my husband earned a salary of approximately $2,500 per month and commissions that varied from $5,000.00 to $17,000.00 on investments that he was responsible for soliciting." (Ex. 10, Michele Baere Decl. at 2.)  In attempting to explain the fee structure,

1   Defendant states that "there was, according to my understanding, no fees charged for trading and

2   the only charge to the investor was the 'performance fee,' predicated on profitability.  The sales

3   commission for bringing in a new account was determined exclusively by Richard Matthews and

4   varied (depending on his absolute discretion) from ½% to 5%.  The average sales commission I

5   earned for bringing in a new account was approximately 2% . . . ."  (Baere Decl. at 4.)  While

6   Defendant Baere has attempted to distinguish the different fee arrangements, he has,

7   nevertheless, failed to establish that he did not know that the commission statement made in the

8   solicitation was false.  In fact, he has admitted the contrary.  While he told customers that they

9   would not make money unless the customer made a profit, he admitted that he would receive a

10  commission (and thus be paid) based on each successful solicitation.  Defendant exhibited at

11  least a careless disregard for the truth by implying to the customer that they are only paid

12  performance fees on profits, while in fact, they are paid a commission based on a percentage of

13  the investment.  (*See* Baere Decl. at 4.)

14          However, Plaintiff has failed to establish the absence of a genuine issue of material fact as

15  to Defendant's knowledge of misrepresentations made about the segregation of accounts.

16  Although such statements were false, Plaintiff has not provided any evidence that Defendant

17  possessed the requisite scienter.  Defendant states that he "was advised by Matthews that the

18  investor's accounts would be 'segregated[,]' " and "the monthly statements that the Company

19  issued to the investors supported that representation."  (Baere Decl. at 5.)  Defendant also states

20  that he "had no access to investor funds and all of the banking statements, according to [his]

21  understanding, went exclusively to Matthews."  (*Id.*)  While based on Defendant's position and

22  involvement with WPT it is likely that Defendant knew the accounts were not segregated, such

23  evidence is insufficient to meet the standard for summary judgment.  Nevertheless, primarily

24  through Defendant's own admissions as well as undisputed evidence, Plaintiff has shown that

25  Defendant Baere knowingly made numerous other misrepresentations during the solicitation of

26  customers.

27          Finally, Defendant Baere's misrepresentations (in which scienter has been established)

28  were material.  As indicated above, a representation is material "if a reasonable investor would

consider it important in deciding whether to make an investment." *R.J. Fitzgerald & Co.*, 310 F.3d at 1328-29 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972)).  Misrepresentations regarding the experience or profitability of a firm or account manager are material because historical success and experience would be considered extremely important factors to a reasonable investor when deciding to invest.  *See CFTC v. Commonwealth Fin. Group, Inc.*, 874 F. Supp. 1345, 1353-54 (S.D. Fla. 1994); *CFTC v. J.S. Love & Assoc. Options, Ltd.*, 422 F. Supp. 652, 655 (S.D.N.Y. 1976); *CFTC v. Next Fin. Serv. Unltd.*, 2006 WL 889421 *4 (S.D. Fla. 2006).  Additionally, both of the declarations provided by WPT investors state that "[b]ased upon representations made . . . by Stephan Baere, it has always been my understanding that White Pine Trust Co. operated  a viable, profitable, segregated, managed foreign currency investment[,]" and "it was based upon this understanding that I made my investment."  (Ex. 2, Burris Decl. at 3; Ex. 3, O'Connor Decl. at 2-3.)  Misrepresentations as to the earning record and history of WPT, the education of WPT employees, Defendant's own employment history, WPT's commission structure, and a fictitious positive reference would weigh heavily on a reasonable investor in deciding whether to invest and, in particular, whether to make an investment in a potentially high risk market.  Such individual misrepresentations, and to a much greater extent, the combination of misrepresentations, are material because they go to the heart of an investor's decision.

Defendant also argues that "clearly [he] did not know that Matthews was stealing investor money."  (Def.'s Opp'n at 8.)  Defendant also states that "the reality is that White Pine Trust was in fact used, in part, as a private fund by Richard Matthews.  He closely guarded and controlled all information and access to investor monies and to the extent he misappropriated them, it was without the complicity or knowledge of Defendant Baere."  (*Id.* at 8-9.)  However, Defendant's argument is misplaced.  Plaintiff is not bringing this action based on a theory of misappropriation; rather, Plaintiff's claim is based on the fraudulent solicitation of customers to invest with WPT.

Lastly, with respect to liability, Defendant argues that there "is no evidence that the particular misrepresentations attributable to [Defendant] caused any losses."  (Def.'s Opp'n at

04cv2093 J (NLS)

12.)  Defendant argues that "the real cause of the losses to the investors was Matthews' theft of their money."  (*Id.*)  In support of this contention, Defendant cites to a reparations case, *Clayton Brokerage Co. of St. Louis, Inc. v. CFTC*, 794 F.2d 573, 578 (11th Cir. 1986), which states that Section 4b . . . incorporates the common law principle that one who misrepresents a material fact is liable only for those losses flowing from actions reasonably induced ("caused") by the misrepresentation."[3]  However, while victims themselves must prove reliance to show that damages were sustained as a result of the fraudulent misrepresentations, "customer reliance is not a necessary element of the CFTC's case in an enforcement action . . . ."  *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 447 (D.N.J. 2000); *see also Slusser v. CFTC*, 210 F.3d 783, 786 (7th Cir. 2000); *CFTC v. Int'l Fin. Serv. (New York), Inc.*, 323 F. Supp. 2d 482, 502 (S.D.N.Y. 2004).  Accordingly, whether or not customers relied upon the misrepresentations is not essential to a finding that Defendant is liable for engaging in fraudulent solicitation.  However, in this case, Plaintiff is also seeking restitution on behalf of customers, which does require a showing of reliance by the customer.[4]  *See Rosenberg*, 85 F. Supp. 2d at 447 ("customer reliance on the defendant's misrepresentation . . . is essential to restitution relief sought to compensate the injured party"); *see also CFTC v. Carnegie Trading Group, Ltd.*, 450 F. Supp. 2d 788, 806 (N.D.Ohio 2006) ("[T]he Court will grant restitution only to those customers who testified at trial that they were misled by [defendants] regarding profit potential and risk of loss, that they relied on those misstatements and or omissions and lost money on the trades.").  "[I]n an action under the CEA, a plaintiff may satisfy the loss causation requirement that the loss be directly related to the misrepresentation or omission by showing that the decision to invest was induced

---

[3] However, the Eleventh Circuit, in *Clayton*, stated that "until a customer *learns* of the risk of trading, his or her continued trading is premised on reliance upon the failure to disclose or [sic] misrepresentations about the risk involved, and the broker will be liable for losses resulting therefrom."  *Clayton Brokerage Co. of St. Louis, Inc.*, 794 F.2d at 579.  Accordingly, Defendant's customers had no way of knowing, and there is no evidence to show that they did learn in time, the truth with respect to Defendant's misrepresentations.

[4] While in a case based upon omissions of material facts, reliance is presumed, *see Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972), the present case is one of misrepresented facts, which requires a showing of reliance.  *See Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479, 485 (S.D. Fla. 1996).  Even "[i]n a mixed case, based on both misrepresentations and omissions, plaintiffs do not enjoy a presumption of reliance."  *See id.*

1   by the misrepresentation or omission and that the investment that was so induced resulted in the

2   losses complained of." *Waters*, 172 F.R.D. 479, 490 (S.D. Fla. 1996).  The issue of reliance is,

3   thus, addressed below in conjunction with Plaintiff's requested relief.

4        Accordingly, Plaintiff has established that Defendant Baere fraudulently solicited

5   customers and potential customers in connection with an offer to enter into an options contract in

6   violation of 7 U.S.C. § 6c(b) and 17 C.F.R. §§  1.1, 32.9.  The Court, therefore, **FINDS**

7   Defendant Baere liable for fraud.

8   **III.   Relief**

9        Plaintiff is seeking relief in the form of injunctive relief, disgorgement, restitution, and

10  civil monetary penalty.  (*See* Pl.'s Mem. Supp. Mot. Summ. J. at 13.)  For the following reasons,

11  the Court **PERMANENTLY ENJOINS** Defendant Baere from committing any future

12  violations of the Commodity Exchange Act; **AWARDS** restitution to Keith Burris and Patrick

13  O'Connor in the amounts of $245,642.48 and $30,000, respectively; **ORDERS** Defendant Baere

14  to disgorge profits in the amount of $600,000; and **ASSESSES** civil monetary penalties against

15  Defendant Baere in the amount of $100,000.

16       **A.**   *Injunctive Relief*

17       Plaintiff is seeking a permanent injunction enjoining Defendant Baere from committing

18  future violations of the Act and from engaging in the trading or solicitation of options.  (*See* Pl.'s

19  Mem. Supp. Mot. Summ. J. at 13.)  "Pursuant to [S]ection 6c of the Commodity Exchange Act, 7

20  U.S.C. § 13a-1, the Commodity Futures Trading Commission is authorized to institute an action

21  seeking injunctive relief whenever it appears that any person "has engaged, is engaging, or is

22  about to engage in any act or practice constituting a violation of any provision of this Act or any

23  rule, regulation, or order thereunder."  *CFTC v. Hunt*, 591 F.2d 1211, 1219 (7th Cir. 1979).

24  Accordingly, upon a proper showing, district courts have jurisdiction to enter "a permanent or

25  temporary injunction."  7 U.S.C. § 13a-1(b).  Once a violation has been established, in order to

26  establish that an injunction should be issued, the moving party need only show a reasonable

27  likelihood of future violations of the Act.  *See id*. at 1220; *S.E.C. v. Ginsburg*, 362 F.3d 1292,

28  1304 (11th Cir. 2004).  Factors to be considered by the court in making this determination

include:  "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *Ginsburg*, 362 F.3d at 1304; *Hunt*, 591 F.2d at 1219 ("When the violation has been founded on systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future misconduct.")

Here, Defendant's misrepresentations were not the result of an isolated incident, but rather were part of a systematic scheme to fraudulently solicit customers.  According to Defendant's response to an interrogatory, he was responsible for soliciting more than eighty-seven people for over $5.7 million.  (*See* Ex. 4; Baere Resp. to Interrog. 12.)  Additionally, Defendant Baere admits to making the same communication to each client.  (*See* Ex. 4; Baere Resp. to Interrog. 11.)  Although Defendant Baere entered into a guilty plea agreement in which he admitted to "knowingly and intentionally conspir[ing] . . . to implement a material scheme to defraud by mak[ing] materially false and misleading representations" and knowingly and intentionally making and causing others to make misrepresentations, Defendant continues to allege that he believed he was offering a legitimate service.  (Ex. 1, Baere Plea Agreement at 3.)  Although there is no indication that Defendant's current occupation presents the opportunity for violations, Defendant's continuous use of misrepresentations presents a reasonable likelihood of future violations.  Thus, the Court finds that a permanent injunction from future violations is warranted based on Defendant's conduct.

Accordingly, the Court **PERMANENTLY ENJOINS** Defendant Baere from committing any future violations of the Commodity Exchange Act, either directly or indirectly.  This includes, but is not limited to, making misrepresentations during the solicitation or promotion in connection with options.  However, the Court declines to permanently enjoin Defendant Baere from trading or soliciting funds for trades of any commodity futures contracts or options accounts, as sufficient evidence for such drastic injunctive relief has not been put forth before the Court.

1     **B.**     ***Restitution and Disgorgement of Profits***

2          Plaintiff seeks restitution in the amount of $5.7 million, representing the amount solicited

3     by Defendant Baere from eighty-seven customers, "less any funds Baere can prove were

4     returned to 'his' customers by WPT."  (*See* Pl.'s Mem. Supp. Mot. Summ. J. at 13-14.)  Courts

5     have authority to order restitution under the "ancillary relief" provision in 7 U.S.C. § 13a-1.  *See*

6     *CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 583-84 (9th Cir. 1982).  However, as

7     described above, relief in the form of restitution on behalf of customers requires a showing of

8     reliance by the customer.  *See Rosenberg*, 85 F. Supp. 2d at 447 (finding that "customer reliance

9     on the defendant's misrepresentation is not a necessary element of the CFTC's case in an

10    enforcement action, but is essential to restitution relief sought to compensate the injured party");

11    *see also Carnegie Trading Group, Ltd.*, 450 F. Supp. 2d at 806 ("[T]he Court will grant

12    restitution only to those customers who testified at trial that they were misled by [defendants]

13    regarding profit potential and risk of loss, that they relied on those misstatements and or

14    omissions and lost money on the trades.").

15         Although the Ninth Circuit has held that in some analogous enforcement cases of

16    pervasive or widespread misrepresentation, reliance may be presumed, such cannot be presumed

17    here.  *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993) (finding reliance to be

18    presumed based on the use of promotional materials, as well as defendant's failure to rebut the

19    presumption).  The Court recognizes that, in some cases, "[r]equiring proof of subjective

20    reliance by each individual consumer would thwart effective prosecutions of large consumer

21    redress actions and frustrate the statutory goals of the section."  *See id.* at 605.  In  *Figgie*, the

22    Ninth Circuit stated that in a case brought under the Federal Trade Commission Act a

23    "presumption of actual reliance arises once the Commission has proved that the defendant made

24    material misrepresentations, that they were widely disseminated, and that consumers purchased

25    the defendant's product."  *Id.*; *see also Blackie v. Barrack*, 524 F.2d 891, 905-08 (9th Cir. 1975).

26         Here, Defendant Baere admitted that the "clients who were considered serious investors

27    would be given the password to enter and research the WPT website and then if a serious interest

28    was shown a 'media kit' would be sent to the potential investor which included a WPT

prospectus . . . ." (*See* Ex. 4; Baere Resp. to Interrog. 11.)  Defendant also admitted that his "communication was always the same to each client about who we were, what the investment vehicle was and how it can help diversify one's investment portfolio." (*See id.*)  However, the Court does not have enough evidence to presume that each of the eighty-seven customers was exposed to the same misrepresentations.   Plaintiff has only provided evidence from two of the eighty-seven customers showing that they specifically relied on Defendant Baere's misrepresentations. (Ex. 2, Burris Decl. at 3; Ex. 3, O'Connor Decl. at 2-3.)  Furthermore, in *Figgie*, the Ninth Circuit had additional evidence of reliance—finding proof of reliance based upon the match between the "sales materials that advocated the purchase of four or five heat detectors per smoke detector, and [the] actual sales ratio," as well as a presumption of reliance based on the promotional materials. *Figgie Int'l, Inc.*, 994 F.2d at 605.  Accordingly, the Court declines to extend a presumption of reliance to all of Defendant's customers for purposes of restitution. *See Carnegie Trading Group, Ltd.*, 450 F. Supp. 2d at 806.

In this case, Plaintiff has only provided evidence showing that two customers relied on Defendant Baere's misrepresentations.  Both of the declarations provided by WPT investors state that "[b]ased upon representations made . . . by Stephan Baere, it has always been my understanding that White Pine Trust Co. operated  a viable, profitable, segregated, managed foreign currency investment[,]" and "it was based upon this understanding that I made my investment." (Ex. 2, Burris Decl. at 3; Ex. 3, O'Connor Decl. at 2-3.)  Accordingly, the Court **AWARDS** restitution to Keith Burris and Patrick O'Connor in the amounts of $245,642.48 and $30,000, respectively, less any amount already returned to these investors.  (*See* Ex. 4; Baere Resp. to Interrog. 12.)  Post-judgment interest after the date of this Order until the restitution is paid in full shall be paid at the post-judgment interest rate set forth in 28 U.S.C. § 1961.  However, Defendant Baere and Richard Matthews shall be jointly and severally liable for such restitution.

As to issue of restitution only, the Court **GRANTS** Plaintiff leave to file documentation, if any, of proof of reliance with respect to the additional investors.  Plaintiff shall file and serve

1    such documentation no later than **May 11, 2007**.  If necessary, Defendant shall file a responsive

2    brief, **as to this issue only**, no later than **May 25, 2007**.

3            Additionally, the Court **ORDERS** Defendant Baere to disgorge profits in the amount of

4    $600,000, as reflected in Defendant Baere's Opposition and Plea Agreement.  (*See* Def.'s Opp'n

5    at 13; Ex. 1.)  However, recognizing that Defendant Baere has already been subject to an order

6    to disgorge $600,000 in the Criminal Action (05CR0874-JM), the above ordered restitution and

7    disgorgement obligations shall be reduced by any amounts recovered pursuant to the Criminal

8    Action, as well as by any amounts recovered by other legal proceedings or collateral agreements.

9            **C.**     *Civil Monetary Penalties*

10           Plaintiff also seeks the imposition of civil penalties on Defendant.  Pursuant to 7 U.S.C. §

11   13a-1, "the court shall have jurisdiction to impose, on a proper showing, on any person found in

12   the action to have committed any violation a civil penalty in the amount of not more than the

13   higher of $100,000 or triple the monetary gain to the person for each violation." 7 U.S.C. §

14   13a-1(d)(1).  While Defendant made numerous misrepresentations in fraudulently soliciting

15   customers, the Court does not find that the maximum penalty of $1.8 million, three times

16   Defendant's monetary gain of $600,000, is warranted.  The Court, thus, **ASSESSES** civil

17   monetary penalties against Defendant Baere in the amount of $100,000.  *See Hudson v. United*

18   *States*, 522 U.S. 93, 95-96 (1997); *see also LaCrosse v. CFTC*, 137 F.3d 925, 932 (7th Cir.

19   1998); *Grossfeld v. CFTC*, 137 F.3d 1300, 1304 (11th Cir. 1998).

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

*Conclusion*

For the reasons set forth above, the Court **GRANTS** Plaintiff's Motion for Summary Judgment.  Additionally, the Court **PERMANENTLY ENJOINS** Defendant Baere from committing any future violations of the Commodity Exchange Act, either directly or indirectly. The Court **AWARDS** restitution to Keith Burris and Patrick O'Connor in the amounts of $245,642.48 and $30,000, respectively; and **ORDERS** Defendant Baere to disgorge profits in the amount of $600,000.  The Court **ORDERS** that such restitution and disgorgement obligations shall be reduced by any amounts recovered pursuant to the respective Criminal Action.  As to issue of restitution only, the Court **GRANTS** Plaintiff leave to file documentation of proof of reliance with respect to the additional investors.  Plaintiff shall file and serve such documentation no later than **May 11, 2007**.  If necessary, Defendant shall file a responsive brief, **as to this issue only**, no later than **May 25, 2007**.  Lastly, the Court **ASSESSES** civil monetary penalties against Defendant Baere in the amount of $100,000.

**IT IS SO ORDERED.**

DATED:  April 11, 2007

_____
HON. NAPOLEON A. JONES, JR.
United States District Judge

cc:  Magistrate Judge Stormes
        All Counsel of Record

21

04cv2093 J (NLS)